The next case will be 08-102932, Cohesive Technologies v. Waters Corporation. Thank you, Your Honor. May I please the Court? There are two issues that I would like to focus on this morning. The first is the District Court's summary judgment of non-infringement with respect to the 25-micron replacement columns. That concerns the claim limitation for average particle size of, quote, about 30 microns. And the second issue that I'd like to focus on is the Court's finding that infringement was not willful in this instance. In both cases, we ask the Court to reverse and remand. With regard to the average particle size limitation, what we're talking about is a measurement of a sample of particles in order to attain the mean or the average diameter. Let me ask you. Even if we agree with the arguments you've made about the construing of the term cloud and have some meaning, what is there in the record that points us to? The second part of that is you tell us then what the construction, the appropriate construction ought to be, which is 25 to 35. Yes, Your Honor. I'm having trouble finding enough support in the record, even if I were to hypothetically agree with you on this one, to substantiate what one skilled in the area has construed about what you mean by specifically 25. Yes, Your Honor. First of all, the specification in one instance refers to the measurement of particles compared to the nominal value of those particles. That's at column 14, line 26. The specification was measuring particles that were said to be 50 microns in diameter, and they were found to be actually 42.39 microns, indicating that it's not surprising to find a difference of as much as 15 percent between the nominal value and the actual measured value. Before that, it talks about a 95 percent confidence factor. Yes, because what we're talking about is a… I'm saying that for purposes of these kinds of measurements, yes, that is, as a rule of thumb, a legitimate place to begin, because we're talking about a statistical distribution of mean diameters. But in addition… Yes, Your Honor, and his testimony, his testimony, which was unrebutted, Waters produced no evidence about what a person of ordinary skill in the art would think, was that a person of ordinary skill in the art, because tolerances cannot be precisely accommodated in this instance with these kinds of particles, that he would expect the reference to 30 microns to include anything between 25 and 35. But Waters didn't produce any contrary evidence, particularly because their own product specifications, which issued before the litigation, before this was ever an issue, when they had to decide whether they were going to sell particles at 30 microns, what would the relevant measure be, they said anything between 25 and 35 microns passes our specification, and that is at page 42, 23 of the record. Anything else in the specification that you could point to us that leads us to the 25 to 35 range? Not in the specification, per se. Not besides the one example that the specification gives, contrasting the measurement with the nominal value. Now, what about the language greater than about 30 microns, and the prosecution history that talks about, not about 30 microns, but 30 microns being sort of a minimal number? Well, the greater than phrase in the limitation obviously defines the lower limit of this range. We're talking, one of the claims describes the range as being between 30 and 500 microns. Most of the claims only define the lower boundary of the range and leave the upper boundary free. But in any numerical range, of course, you're going to have to decide what is the lower boundary. So you're saying the word about sort of means that there's a range to the end of the range. Exactly. Well, that's exactly right. Even if we accept that, what about the prosecution history, which may have inadvertently left out the word about, but there are arguments and there are statements distinguishing the prior art that talk about 30 microns and things being greater than 30 microns and 30 micron being the minimum? Well, Your Honor, the prosecution history cannot be used to remove plain language, which is what we find in the claims. And if during the prosecution history there were times when the argument was not as precise as it might have been, that still doesn't remove the term about from the plain language which the patent office granted. It could be a disclaimer if it was clear and unmistakable. The district court, yes, it could be if it was clear and unmistakable. The district court found that there was no disclaimer, that there was no prosecution history to stop it here, which was the reason that we contend that even if the court were to find that the term about doesn't comprehend particles as low as 25 microns, because this is a numerical range, it would still permit the application of a document of equivalence, particularly under the U.S. Phillips case, to the lower end of that range. Well, but if we were to agree with you that the about has some meaning and even adopt your range or some other range, would you agree then that under our case law you'd lose the DOE? I wouldn't need the DOE. I think... Well, but I'm asking, I mean, humanly, let's assume you need, I mean, would you agree as a legal matter that DOE would not apply? No, no, I would not agree. So DOE, you still get DOE if you have above 30 microns and the range construed as 25 to 35. Yes, Your Honor. As the lower range. Yes, Your Honor. Given the language in the claims, do you think you still get DOE on top of that? I believe that about only refers to the literal scope of the claim, and the court has held that the doctrine of equivalence nevertheless applies to numerical ranges. And so, yes, that would still be the case. But in either one of these instances, it's hard to imagine a situation where the claim either literally or under the doctrine of equivalence would not reach to at least 29 microns. Well, don't you have a problem with your argument? I mean, isn't something in the argument smack of indefiniteness? I mean, how can one say, okay, about has to have certain meaning, and then your argument is, what does about mean? And it's like, well, it might mean 29, it might mean 25. I mean, if we're in that discussion about we're not clear what it means, let's just pick a number out of the air, doesn't that raise an indefiniteness? I don't believe so, Your Honor, because unlike the situation in Amgen, we have expert testimony here about what a person of ordinary skill in the art would interpret this claim to mean. And that was between 25 microns and 35 microns. We have similar corroborating evidence from the defendant itself in the form of its own product specs. So you have a great deal of information on which to evaluate this. It's not at all indefinite. And as I say, in either one of these instances, you arrive at either through the application of the phrase about which the court read out of the claim, or through the application of the doctrine of equivalence which the court decided not to apply. You will reach at a basis for reversing the summary judgment in this instance because there would clearly be disputed issues of fact. Again, I'm sorry, but how would you apply then the doctrine of equivalence? I mean, what is your bottom line here? That above means 29 and then you go DOE for the 29? I mean, how does the doctrine of equivalence apply in this context? The doctrine of equivalence may not apply, Your Honor, but until we have a claim construction and until we know what we're trying to apply it to, I think it's clear that all the court needs to do at this point is to clarify that the doctrine of equivalence does, as it said in the U.S. Phillips case, apply to the ends of a numerical range. That's all the court needs to do in this instance. Turning then to the second point that I'd like to discuss, the issue of wealthiness. We begin with a fact that is undisputed, which is that the trial court's findings were in error. And even Waters concedes that at page 31 of his brief. The court here found that Oasis particles collapse at pressures of less than 5,000 psi. And that finding was clearly wrong. The evidence, in fact, was that Oasis particles withstood pressures of at least 8,000 psi. And in fact, we don't know what the ultimate pressures would be because Waters never presented any evidence of testing to failure to determine how rigid these particles actually were. This was a critical error. It was critical because, as the court said, its definition of the term rigid turns on whether the particles collapse. Made that statement at page 47 of the appendix. And so we have a situation where the court is making its determination, making a determination that is obviously based on a critical misunderstanding of the facts. Applying Seagate to this situation, Waters' own tests, not only tests done by Mr. Quinn, but Waters' own tests showed that there was an objectively high likelihood that these Oasis particles would be considered rigid. But I guess the difficulty, I mean, I understand your point about the district court having made a statement. I don't know if you've kind of heard it here. The difficulty I'm having is under the test in Seagate, do you agree that if Waters' argument with respect to the definition of the claim construction of the term rigid had prevailed, then this would be all right? Obviously, there'd be no willfulness. If they had prevailed, there'd be no infringement. So if they have sort of a good faith basis, I mean, wasn't there, why do I care if the district court made a mistake, given that we can look at the record and see what they argued on rigid, and if they had prevailed, and if that wasn't under the rules of Seagate, we don't fill that up. Why isn't it clear to us that willfulness doesn't occur? Well, Your Honor, I agree that if they had prevailed on their definition of rigid, there would not have been any infringement. But our point is that they didn't do any kind of study of what rigid meant. They didn't attempt to try to construe the claim to begin with. What they did was to try to find an excuse around the issue by focusing on compressibility, and compressibility wasn't part of the claim language. At this point now, I'd like to reserve the remainder of my time for both. Thank you. Thank you. Good morning, and thank you. This case presents a number of issues. Well, this list is limited to the two we talked about this morning. Well, I'll be glad to answer our questions. Well, there's a cross-appeal as well, in both the cross-appeal by Waters and the issues that Mr. Steer is addressing now. The central proposition at issue is whether an applicant for a patent has to live with the statements that they make in order to get the patent allowed. Does the vote have any meaning in the claim? There are many cases that say it does. It's difficult to find what that meaning is here, because- Well, look, there are two different questions. The question whether it has any meaning, and then the second part of that question is, if it has any meaning, what is that meaning? So let's stick with the first part first. Trying to- If it's meaningful. Trying to do that. It normally connotes some leeway, wiggle room, extension of claim scope, and as Coisa Vargas said, it's brief. Is there anything in this record to suggest that that doesn't apply in this case? Yes, there is. Yes, there is. There's the declaration of Dr. Guillauchon that was submitted after final rejection in order to get this case allowed. And Dr. Guillauchon said explicitly that 30 microns was a minimum, and that the particle diameter had to be in excess of 30 microns. Judge Woodlock at the district court looked at the language of the claim. He said the ordinary and sensible meaning of the language in the claim was that 29 was less than 30. He said that that language had to be applied with some rigor in order to avoid the indefiniteness problem. Because once you start going below 30, using the word about as your key to do that, you don't know where to stop. So you're, in effect, reading the word about out. Well, I- So you just can't have any meaning, and if it has any meaning at all, it injects a level of indefiniteness into the claim. I think that's where you end up, but I don't think that Waters gets you there alone.  Waters and the district court both followed what Cohesive argued to the patent office. And what we're asking is that Cohesive live with the statements that it made to the patent office in order to get the case allowed. As to the doctrine of equivalence, Judge Woodlock at the district court also addressed that issue. And he said that if the doctrine of equivalence was used to give Cohesive that extension of claims scope, that, again, they would simply be ignoring the explicit language of the claim. So we start, as Phillips requires, with the language of the claim, and we look then to the prosecution history. The language of the claim says greater than about 30 microns. Cohesive conveniently and frequently omits the greater than language. They refer to the testimony of Mr. Pirro, and I note that in his declaration, he likewise never mentions greater than. That's not what he said. What he said and what he directed his testimony to was part- The paper you're referring to? This is in the record at 3900. And Mr. Pirro talked about particles having an average diameter of about 30 microns. But that's not the claim language. The claim language, as Judge Woodlock recognized, requires particles greater than. And that's exactly what- Greater than 5. Yes. Greater than about 30 microns. So you're saying, you know, you're suggesting that the prosecution history leads us to read the word about the claim. Yes, Your Honor. Following what Dr. Guillauchon told the patent office in his declaration in order to get this case allowed. You also seem to suggest, and maybe I misheard when you responded to Judge Lynn, that in order to preserve the definiteness of the claim, the validity of the claim, this was about what was read out of the claims. In this case, I think on the facts that we are presented with here, again, that's where you end up. But the district court didn't say that. Well, the district court said that under all ordinary and common sense definitions, 29- I think it's before that, Your Honor. I apologize, I don't have that sign at my fingertips in front of me. Well, go ahead. I'm sorry. The district court made three key observations. The first observation was that the ordinary common sense definition of the terms in the claim, 29 was less than 30. He said the specified dimensions would be meaningless if not interpreted with some rigor of his language. And he said including a column of 29.01 micron particles as covered by the patent, and he was referring here to the doctrinal equivalence, would be inconsistent with the explicit language of the claim. So did he refer or rely on the prosecutive's claim of language that you and Judge Lynn have been discussing here? I don't believe Judge Woodlock talked about the Gieshon Declaration on this point. So in this claim construction of the law, he wasn't relying on the disclaimer that she made? I think that's correct, Your Honor. I didn't find Judge Woodlock talking about the Gieshon Declaration. Mr. Stier made a misstatement. He said that Judge Woodlock made a decision that there was no prosecution history disclaimer as to this issue. That's not correct. I don't believe Judge Woodlock addressed the prosecution history in the Gieshon Declaration on this point. Did he make the argument? Was that your argument below to the judge? Yes. Yes, the argument was that the language in the claim as stated in the patent and as argued during the prosecution required particles that were greater than about 30 microns and greater than 30 was what Gieshon had said. Let me just assume hypothetically that we were just going to screw about as having some meaning that was stated in the disclaimer argument. What is it, in comparison to the other sides claiming that they were holding about means 25 to 35? What in the record supports, I mean I assume you would say that about has any meaning that's much more narrow? Well, we're on the indefinite issue here, and I don't know where the limit is. Judge Woodlock asked me the same question, and I gave him the same answer that I'm going to give you, which is I don't know if you go south of 30 how far you're entitled to go. I don't know. And based on this record and this patent and this specification and this prosecution history, there's no clue. Did you have any sort of proving a negative? Did you have any testimony, any expert testimony saying that on the record? No. This issue came up just about a year ago when after a long hiatus by the court, Judge Woodlock brought us all back, and we addressed an argument in front of him. All the testimony had been finished years earlier. And he brought us back to address all of the pending cases because he wanted to get them resolved. This issue came up in the third of the three cohesive litigations, and we spent a certain amount of time discussing it with him in the courtroom. There was no further testimony or evidence in any respect. Is definiteness, have you raised that as an affirmative defense or a contra-plaint? I know you've got a validity, obviously. Yeah. In the case that was tried to the jury, this issue did not arise because the particles in the columns that issued in that case were not 25 micron particles. They were 30 micron particles. And we left it at that, and we focused on the other issues. In the case that was brought after the jury trial, Cohesive alleged that the 25 micron columns infringed and were within the scope of the claim language. And we didn't have further proceedings on that case while the first case and the second case on the method claims were making their way through the litigation. So it really wasn't until 2007 that we dug into this issue at all. What about unlawfulness? I think you conceded in your briefs that the judge's analysis, what got him to the fact that there's no lawfulness, was a misstatement. Well, it's interesting. We concede that Judge Woodblock said what he said. But if we take a look at what he said, he didn't just say one thing. He said three, and here we go. I'm in Judge Woodblock's opinion on page 40, 42, and 43. On page 40, down near the bottom, he makes a mistake. He says the oasis particles, he's talking about Bouvier's testing. Bouvier did the Enstrom testing, showing that the polymeric oasis particles compressed. There never was any dispute that they're polymeric particles. There never was any dispute that they're made of divinyl benzene, which is what Guillauchon talks about in his disclaimer. But Judge Woodblock says that the oasis particles collapsed when subjected to a pressure of 5,000 psi. That's a mistake. They didn't collapse. They compressed, and that's what the evidence showed. But Judge Woodblock understood that. If we go to the very next sentence, he says Bouvier's experiments also showed the particles resisted post-compression deformation. Now, he wouldn't be talking about post-compression deformation if the particles had collapsed. They would have been deformed. So there's already an ambiguity. If we go two pages over onto page 42, Judge Woodblock gets it right. Three lines or four lines from the bottom, he talks about oasis particles were compressible, and that's precisely what Bouvier's evidence showed. And then, just to make it worse, on the next page, 43, right in the middle, Judge Woodblock hits both balls at once and says that there was substantial collapse during compression. Well, there was no collapse. There was compression. That's what the evidence showed. So Judge Woodblock had some language in here that didn't quite get it right. It wasn't as precise as it should have been. But it's very clear that Judge Woodblock understood in his claim construction that compression or compressibility, changing density and volume under pressure, was the first prong. It's what it says in the PATH specification. The second prong was plastic deformation, which is collapsing and staying collapsed. But the opposite of plastic deformation is elastic deformation, which is exactly what we have here. Polymeric particles that compress, and when you release the pressure, like a tennis ball, they come back. And Judge Woodblock understood that. He knew that, and we discussed this with him explicitly. We talked about it, I remember using the phrase, nerf ball instead of tennis ball, and I think that's in our brief. But the same point is there. The claims require rigid, solid particles. Cohesive told the patent office that rigid, solid particles have to be incompressible. It told the patent office that polymeric particles, such as divinyl, benzene, and the like, in Guillaume's phrase, referring to the range of particles in a fan, he took those off the table in a broad disclaimer, saying that those polymeric materials were not considered sufficiently rigid within the meaning of the claims. There was no dispute that water's particles are 80% divinylbenzene. Cohesive made the argument that water's particles are divinylbenzene cross-linked with another polymer. A fan talks explicitly about a number of different polymers. It's open-ended language, it uses such-as, it's not closed language, so it's not limited to those particular polymers. But again, even in a fan they point out cross-linking. And so when Guillaume, in order to get this patent allowed, said those kinds of polymeric materials in the prior art, which a fan called rigid, those are not what we're calling rigid in this claim when we say rigid solid particles. Water says cohesive has to live with the argument that it made in order to get the case allowed. This is not a case where, as Judge Woodlock, and we believe this was a mistake on his part, where Judge Woodlock was entitled to impose a performance standard, saying, well, we'll test the particles, and we'll see if they compress, and we'll see if they're rigid or they're not rigid. There was no testing of a fan's particles. There was no performance standard applied for a fan's particles. When Guillaume submitted his declaration and told the patent office that all of those polymeric materials are out of the case, they're out of the patent, they're out of the claims, we think cohesive should have to live with the argument that it made in order to get the case allowed. Judge Woodlock held that this case was not amenable to the doctrine of equivalence. It was governed by CIMED, and based on the language of the claim, the doctrine of equivalence was not amenable. On what basis would cohesive not be entitled to at least have the doctrine of equivalence considered in the facts of this case? Are you asking about the application of doctrine of equivalence to rigid particles? The issue of rigid particles? To the part of the claim we were discussing earlier, the greater than about 30 microns. Well, I think that the doctrine of equivalence does not allow you, there's the all elements rule that says that you cannot take out one of the elements of the claim by application of the doctrine of equivalence. You're saying something that's less than about 30 microns can't be equivalent to something... Unless we are in Alice in Wonderland, less than 30 is not greater than, and the claims require greater than. Okay, thank you. My time is up, thank you. If you go south of 30 microns, where do you stop? You ask a person of ordinary skill in the art how they would interpret the claim. We did that. We got an answer. It was 25 to 35 microns. They didn't do that. You know why they didn't do that, because their own product literature already established the same thing. But that's why the claim isn't indefinite. They never raised indefiniteness at any time. Of course, the fact is that when we tried this case, the same patent was at issue. If it was indefinite... The judge didn't construe it as between 25... The judge didn't construe it at all, actually. He just construed it as not being 29.01. The point here, the other important point for you to appreciate is that there was no particular magic at 30 microns. There was no prior art at 29 microns. There was no prior art as close as 20 microns. That was the closest prior art that we were dealing with here. There was no reason for the court to establish a strict boundary all the way up to 30 microns. Let me focus now on collapse, and the reason why collapse was so critical in this case. It's because, as Judge Woodlock said himself at page 44 of his order, which I believe is at page 47 of the appendix, the definition of rigid is first and foremost a definition that turns on whether the particles collapse under pressure. There's a reason for that. What we're trying to do in this instance is to preserve the space between the particles so that samples can be pumped through there at high pressures. If the particles compress or collapse, they plug up those spaces and the whole column, like an avalanche, plugs up. That's what we're trying to do. We're trying to make sure that the space between the particles remains so that under high pressure, the sample can be pumped through there to enjoy the benefits of this particular technique. That's the crux of the issue. Now what we have here is waters knowing that they can use their particles in the same application at the same high flow rates without any problems. They know that their particles will withstand pressures of up to 8,000 psi without collapsing, much less 5,000 psi. They're using them in a column that they have never made before with exactly the same dimensions that cohesive has at exactly the same flow rates. And the only basis that they had after their scientist, Dr. Noya, told them that they had a problem with plane 15, the only rationalization that they had for going ahead and continuing to sell their product, which they were already doing. Judge Woodlock made a mistake on that point as well, but they were continuing to sell their product. The only twig that they could grasp was the definition of rigid. And when you look at what they did, when you look at the opinion that was produced here, in spite of the fact that they knew that these were not polystyrene type particles, it's the polystyrenes that are the focus of the aphaean reference. And let me point you to the page where that is. That's at page 5232 and 5233 of the appendix. We're talking about polystyrenes. All right, sir. Thank you.